**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| SABA CAPITAL MASTER FUND, LTD., and SABA CAPITAL MANAGEMENT, L.P.,  )<br><br>Plaintiffs,  )<br><br>v.  )<br><br>ASA GOLD AND PRECIOUS METALS, LTD., MARY JOAN HOENE, BRUCE HANSEN, WILLIAM DONOVAN, and AXEL MERK,  )<br><br>Defendants.  ) | No. 24-cv-690 (JGLC) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>SABA'S MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

**STATEMENT OF FACTS** ................................................................................................4

    I.     Saba's Investment in ASA ...............................................................................4

    II.    ASA Adopts the Poison Pill ..............................................................................5

    III.   This Action .........................................................................................................7

**LEGAL STANDARD** ....................................................................................................8

**ARGUMENT** ...................................................................................................................9

    I.     Judgment Should Enter in Saba's Favor that the Poison Pill Violates
           Section 18(d) of the Investment Company Act and Should Be
           Rescinded. .........................................................................................................9

           A.    The Poison Pill Violates the ICA's Plain-Text Requirement
                  That the Fund Only Issue Rights to Purchase Securities
                  "Ratably." ...........................................................................................10

           B.    The Second Circuit's Decision in *Nuveen* Forecloses Any
                  Possible Attempt to Reconcile the Pill with the ICA ................................11

           C.    The ICA's Policies and Purposes Require Interpreting and
                    Applying § 18(d) in Saba's Favor ...............................................17

           D.    The Poison Pill Also Violates the ICA's Plain-Text Prohibition
                  on Such Subscription Rights Extending Beyond 120 Days. .....................18

    II.    Rescission is Mandatory because the Poison Pill Conflicts with Both
           the Text and Purposes of the ICA. ........................................................21

    III.   Saba is Entitled to Declaratory and Injunctive Relief, Against All
           Defendants, as Customary Incidents of Saba's Action for Rescission ................23

**CONCLUSION** ...........................................................................................................25

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aetna Cas. & Surety Co. v. Aniero Concrete Co., Inc.*,
    404 F.3d 566 (2d Cir. 2005)................................................................................8

*Chabot v. Empire Trust Co.*,
    301 F.2d 458 (2d Cir. 1962)................................................................................17

*City of Providence, Rhode Island v. Bats Glob. Markets, Inc.*,
    14-cv-2811 (JMF), 2022 WL 3018090 (S.D.N.Y. July 29, 2022)..........................16

*Conn. Nat'l Bank v. Germain*,
    503 U.S. 249 (1992)............................................................................................10

*Dobrova v. Holder*,
    607 F.3d 297 (2d Cir. 2010)................................................................................10

*Dynamics Corp. of Am. v. CTS Corp.*,
    805 F.2d 705 (7th Cir. 1986) ..............................................................................16

*Eaton Vance Senior Income Trust v. Saba Capital Master Fund, Ltd.*,
    2084-cv-1533-BLS2, 2023 WL 1872102 (Mass. Super. Ct. Jan. 21, 2023)................... *passim*

*Eaton Vance Senior Income Trust v. Saba Capital Master Fund, Ltd.*,
    2084-cv-1533-BLS2, 2021 WL 2785120 (Mass. Super. Ct. Apr. 7, 2021)............................13

*Gamble v. Tyson*,
    17-cv-6635 (LAK) (SN), 2019 WL 5722129 (S.D.N.Y. Jan. 4, 2019) ....................8

*Georgia-Pacific Corp. v. Great N. Nekoosa Corp.*,
    728 F. Supp. 807 (D. Me. 1990) ..........................................................................16

*Harvard Indus, Inc. v. Tyson*,
    86-cv-74639 (DT), 1986 WL 36295 (E.D. Mich. Nov. 25, 1986)..........................16

*Herpich v. Wallace*,
    430 F.2d 792 (5th Cir. 1970) ..............................................................................18

*Hess v. Cohen & Slamowitz LLP*,
    637 F.3d 117 (2d Cir. 2011)................................................................................10

*Indep. Inv. Protective League v. Sec. & Exch. Comm'n*,
    495 F.2d 311 (2d Cir. 1974)...........................................................................17, 20

*Marvel Characters, Inc. v. Simon*,
   310 F.3d 280 (2d Cir. 2002)................................................................................10

*Mathers Fund, Inc. v. Colwell Co.*,
   564 F.2d 780 (7th Cir. 1977) .............................................................................18

*MCC Non Ferrous Trading Inc. v. AGCS Marine Ins. Co.*,
   14-cv-8302 (JCF), 2015 WL 3651537 (S.D.N.Y. June 8, 2015).............................8

*Mudge v. Zugalla*,
   939 F.3d 72 (2d Cir. 2019)...................................................................................8

*Neuberger Berman Real Est. Income Fund, Inc. v. Lola Brown Tr. No. 1B*,
   485 F. Supp. 2d 631 (D. Md. 2007).................................................................20, 21

*Neuberger Berman Real Estate Income Fund, Inc. v. Lola Brown Trust No. 1B*,
   342 F. Supp. 2d 371 (D. Md. 2004) .........................................................15, 16, 20

*Option Advisory Serv. v. Sec. & Exch. Comm'n*,
   668 F.2d 120 (2d Cir. 1981).............................................................................18, 20

*Oxford University Bank v. Lansuppe Feeder, LLC*,
   933 F.3d 99 (2d Cir. 2019)......................................................................... *passim*

*Providence and Worcester Company v. Baker*,
   378 A.2d 121 (Del. 1977) ..................................................................................16

*S.E.C. v. Sloan*,
   436 U.S. 103 (1978)........................................................................................19, 20

*Saba Capital CEF Opportunities I, Ltd v. Nuveen Floating Rate Income Fund*,
   21-cv-327 (JPO), 2022 WL 493554 (S.D.N.Y. Feb. 17, 2022) ...................... *passim*

*Saba Capital CEF Opportunities I, Ltd. v. Nuveen Floating Rate Income Fund*,
   88 F.4th 103 (2d Cir. 2023) ........................................................................ *passim*

*Saba Capital Master Fund, Ltd. v. BlackRock Municipal Income Fund, Inc.*,
   23-cv-5568 (JSR), --- F. Supp. 3d ---, 2024 WL 43344 (S.D.N.Y. Jan. 4,
   2024) ........................................................................................................ *passim*

*Saba Capital Master Fund, Ltd. v. ClearBridge Energy Midstream Opportunity
   Fund Inc.*,
   No. 23-08104 (2d Cir. 2023), Dkt. 101...................................................................2

*SEC v. Imperiali, Inc.*,
   12-80021-cv, 2013 WL 12080193 (S.D. Fla. Sept. 25, 2013)................................19

*Transamerica Mortgage Advisors (TAMA) v. Lewis*,
444 U.S. 11 (1979)...............................................................................................24

*United States v. Nat'l Ass'n of Securities Dealers*,
422 U.S. 694 (1975).............................................................................................17

**Statutes**

15 U.S.C. § 80a-1 ...................................................................................3, 4, 17, 18

15 U.S.C. § 80a-18 ........................................................................................ *passim*

15 U.S.C. § 80a-46 ........................................................................................ *passim*

15 U.S.C. § 80b-15 ...............................................................................................24

**Rules**

Fed. R. Civ. P. 56 ...................................................................................................8

**Other Authorities**

*Boulder Total Return Fund, Inc.*,
2010 WL 4630835 (S.E.C. No-Action Letter Nov. 15, 2010)................................4, 15, 17, 24

John C. Coates IV & R. Glenn Hubbard, *Competition in the Mutual Fund
Industry: Evidence and Implications for Policy* .....................................................4, 5

*Ratable*, Black's Law Dictionary (2d ed.)..............................................................10

*Ratable*, Merriam Webster (11th ed. 2003).............................................................10

Wright & Miller, *Federal Practice and Procedure*, § 2718 (3d ed.)...........................8

Plaintiffs Saba Capital Master Fund, Ltd. and Saba Capital Management L.P. (collectively, "Saba") bring this action against ASA Gold and Precious Metals, Ltd. ("ASA") and its current or former Directors Mary Joan Hoene, Bruce Hansen, William Donovan, and Axel Merk (together with ASA, "Defendants"), seeking rescission of a poison pill Defendants adopted in violation of federal law. Saba is the beneficial owner of significant holdings in ASA, a closed-end fund regulated by the Investment Company Act of 1940 ("ICA"). Section 18(d) of the ICA provides:

> It shall be unlawful for any registered management company to issue ***any warrant or right to subscribe to or purchase a security*** of which such company is the issuer, except in the form of warrants or rights to subscribe ***expiring not later than one hundred and twenty days after*** their issuance ***and issued exclusively and ratably*** to a class or classes of such company's security holders . . . .

15 U.S.C. § 80a-18(d) (emphases added).

Nevertheless, in contravention of the ICA's clear mandates, Defendants adopted a rights plan, of only nominally "limited-duration," granting subscription rights to ***some*** shareholders— enabling them to buy additional shares at a price of $1.00 per share—while expressly denying those same rights to ***other*** shareholders, like Saba (the "Poison Pill," or "Pill"). Plaintiffs' Rule 56.1 Statement of Undisputed Material Facts ("R56.1") ¶¶ 5, 8; Ex. 5, Dec. 31, 2023 Rights Agmt.; Ex. 8, Apr. 26, 2024 Rights Agmt. Specifically, the Poison Pill purports to attach a right to acquire additional shares to "each outstanding common share" in ASA. R56.1 ¶¶ 5, 8; Ex. 5; Ex. 8. But such rights are "null and void" when held by investors owning 15% or more of ASA's outstanding common shares. Ex. 5 § 3(d); Ex. 8 § 3(d). The upshot: some shareholders (those owning < 15%) are granted rights; while others (those owning > 15%) are denied the same. Ex. 5 § 1; Ex. 8 § 1. Thus, directly contrary to the requirements of Section 18(d), subscription rights under the Pill are not issued "ratably" (*i.e.* proportionately) to the class of common shareholders. The Pill, on its face, violates the ICA.

1

Recent case law in this Circuit confirms the unlawfulness of ASA's discriminatory treatment of shareholders via the Pill. The Second Circuit recently rescinded a similarly unlawful entrenchment tactic—which also targeted Saba—that operated to deny shareholders their equal voting rights guaranteed by Section 18(i) of the ICA. *See Saba Capital CEF Opportunities I, Ltd. v. Nuveen Floating Rate Income Fund*, 88 F.4th 103, 121 (2d Cir. 2023). That decision followed a steady drumbeat of rulings rescinding provisions which operated to entrench management and deny equal shareholder rights, and granting summary judgment for Saba without the need for discovery. *See Saba Capital Master Fund, Ltd. v. BlackRock Municipal Income Fund, Inc.*, 23-cv-5568 (JSR), --- F. Supp. 3d ---, 2024 WL 43344, at *6 & n.13 (S.D.N.Y. Jan. 4, 2024) (Judge Rakoff explaining that, given statutory policy to "correct and prevent certain abusive practices in the management of investment companies" for the protection of shareholders, ICA required rescission of defense tactic inconsistent with that policy);[1] *Saba Capital CEF Opportunities I, Ltd v. Nuveen Floating Rate Income Fund*, 21-cv-327 (JPO), 2022 WL 493554, at *4, *6 (S.D.N.Y. Feb. 17, 2022) (Judge Oetken rescinding discriminatory defense mechanism as a matter of law, after concluding "personal discrimination against an investment company shareholder would be flatly inconsistent with the purposes" of ICA); *see also Eaton Vance Senior Income Trust v. Saba Capital Master Fund, Ltd.*, 2084-cv-1533-BLS2, 2023 WL 1872102, at *8 (Mass. Super. Ct. Jan. 21, 2023) (rescinding as a matter of law defense mechanism found contrary to the "fundamental requirement[s]" and "inconsistent with the purposes" of ICA).

Critically, those decisions hold that the ICA does not recognize or tolerate a "share-shareholder distinction"—the misguided proposition that, while the ICA prohibits discrimination

---

[1]    An appeal of the *BlackRock* judgment by the defendant funds remains pending, and was submitted for review following argument on April 12, 2024. *See Saba Capital Master Fund, Ltd. v. ClearBridge Energy Midstream Opportunity Fund Inc.*, No. 23-08104 (2d Cir. 2023), Dkt. 101.

among **shares**, it somehow tolerates discrimination among **shareholders.** *Nuveen*, 88 F.4th at 118–20; *Nuveen*, 2022 WL 493554, at*4 (Judge Oetken noting he was "unconvinced" by the defendant funds' attempted distinction, terming it a "meaningless" one); *Eaton Vance*, 2023 WL 1872102, at *7 (likewise calling the distinction "meaningless"). The reasoning of those decisions applies with equal force here: ASA cannot claim the Pill ratably issues subscription rights to all shares while it also expressly voids such rights—*i.e.*, expressly makes them ***not ratable***—when the shares are held by certain shareholders. Ex. 5 §§ 1, 3; Ex. 8 §§ 1, 3.

Separately and independently, the Pill also violates Section 18(d)'s requirement that any subscription rights "expir[e] not later than one hundred and twenty days after their issuance," Defendants have already allowed their Pill to take continuous effect for a period of ***at least 236 days***, also in clear violation of the ICA. The Poison Pill was adopted on December 31, 2023, with an ostensible expiration of April 29, 2024. *See* R56.1 ¶¶ 5–6; Ex. 5, Dec. 31, 2023 Rights Agmt. Several days before that date, however, on April 26, the Pill was readopted in substantially the same form, *see* R56.1 ¶¶ 8–9; Ex. 8, Apr. 26, 2024 Rights Agmt., meaning its provisions have remained effective continuously since December 2023, *see* R56.1 ¶ 8. In its current form, the Pill is nominally set to expire on August 23, 2024, although Defendants may attempt to continue to extend the operation of the Pill absent judicial intervention. *Id*.

Saba respectfully requests that this Court enforce the ICA's plain requirements that subscription rights may only be issued "exclusively and ratably" to a fund's shareholders, and may not extend more than 120 days after issuance. 15 U.S.C. § 80a-18(d). Invalidating the Poison Pill furthers Congress's purposes when it enacted the ICA: protecting against investment companies issuing "securities containing inequitable or discriminatory provisions" and failing to protect the rights of "***the holders***" of the fund's securities. 15 U.S.C. § 80a-1(b)(3) (emphasis added). Just like

the defendant funds in *Nuveen*, *BlackRock*, and *Eaton Vance*, ASA cannot be run "in the interest of" entrenched fund management rather than for the benefit of "all classes" of "security holders." *Id.* § 80a-1(b)(2). Accordingly, summary judgment should enter in Saba's favor, the Poison Pill should be rescinded and declared void, and Defendants should be enjoined from further extending the operation of the Pill.

## STATEMENT OF FACTS

### I.    Saba's Investment in ASA

Plaintiff Saba Capital Management is a New York-based manager for certain investment funds, including Plaintiff Saba Capital Master Fund, Ltd. Amended Complaint, Dkt. 12 ("Compl.") ¶ 7; R56.1 ¶ 1. Saba holds shares in ASA, a federally registered investment company subject to the requirements of the ICA. R56.1 ¶ 2.

ASA is closed-end fund. Unlike the more common open-end funds, closed-end funds issue a fixed number of shares and are "not required to buy back (*i.e.* 'redeem') shares from their shareholders." *Nuveen*, 88 F.4th at 108; R56.1 ¶ 3. While "[t]his affords closed-end funds more leeway in deciding where to invest their funds' assets," since they need not "maintain deep cash reserves or sell their securities to honor shareholders' redemptions," it also means that "closed-end funds can trade at prices significantly below" their net asset value ("NAV"), or the total value of the fund's assets minus its liabilities. *Id.*; R561. ¶ 4; Weinstein Decl. ¶ 4.

In closed-end funds, like ASA, a "shareholder does not have the right to compel redemption of his shares at asset value." *Boulder Total Return Fund, Inc.*, 2010 WL 4630835, at *6 n.28 (S.E.C. No-Action Letter Nov. 15, 2010). Closed-end fund shareholders thus lack the ability to "vote with their feet" by redeeming shares, which would provide a natural check on fund management. *Id.* Accordingly, without an effective mechanism for removing trustees, shareholders in closed-end funds are left stuck in an underperforming vehicle. *See generally* John C. Coates IV

& R. Glenn Hubbard, *Competition in the Mutual Fund Industry: Evidence and Implications for Policy,* 33 J. OF CORP. LAW 151 (2007)*.*

ASA is an especially chronic underperformer, and has traded at a substantial discount to its NAV. R56.1 ¶ 4. From December 1, 2022, to November 30, 2023, for instance, ASA's average discount to its NAV was -14.6%. *Id.*; Ex. 3, ASA Annual Report FY23 at 2 (the discount was as high as -17.3% during that period). Recognizing the potential to improve the Fund's performance, Saba acquired significant beneficial ownership interests in ASA. Weinstein Decl. ¶ 4. As of December 31, 2023, Saba was the beneficial owner of 16.87% of ASA's outstanding common shares, making it the largest investor in the fund. R56.1 ¶ 2; Weinstein Decl. ¶ 5.

Saba's investment in ASA is consistent with its "business strategy" more generally which, as the Second Circuit recently described it, "involves buying voting shares in discounted funds and monetizing discounts by, for example, electing new boards of directors, advocating for measures authorizing the buyback of shares at or near NAV, and/or converting funds to open-end structures." *Nuveen*, 88 F.4th at 108. So too, here, Saba has developed its position in ASA with the intent and desire to unlock value for all shareholders, including by exercising the voting rights rightfully associated with Saba's economic stake. *See* Weinstein Decl. ¶ 4.

## II.    ASA Adopts the Poison Pill

In December 2023, Defendants adopted the Poison Pill, with the express aim of discriminating against Saba and preventing Saba from further increasing its ownership stake. R56.1 ¶¶ 5–7; Ex. 5. ASA's discriminatory intent was no secret. In its public announcement of the Pill, ASA stated that the "limited-duration Rights Plan was adopted in response to the rapid and significant accumulation of ASA shares by Saba," and that it was expressly "intended to prevent Saba's unilateral attempt to obtain creeping control of the Company." Ex. 6, ASA Press Release (Jan. 2, 2024); Ex. 9, ASA Press Release (Apr. 29, 2024).

Defendants' adoption of the Pill was a transparent attempt to entrench incumbent management in office. As explained by Institutional Shareholder Services, one of the leading independent proxy advisory firms, Defendants are using the Pill "to keep the dissident at bay, without establishing a proper reason for doing so." ISS Proxy Analysis for ASA (Apr. 12, 2024).

The Pill operates as follows: ASA first authorized and declared a dividend distribution of one "right" for each outstanding common share in the fund. R56.1 ¶¶ 5–6, 8–9; Ex. 5 §§ 1, 3; Ex. 8 §§ 1, 3; Ex. 6; Ex. 9. After a defined "Triggering Event," each right enables its holder to acquire an additional common share in ASA at a purchase price of $1.00 per share. R56.1 ¶¶ 5–6, 8–9; Ex. 5; Ex. 8; Ex. 6; Ex. 9. "Alternatively, (on a cashless basis) each outstanding right" may also "be exchanged for one common share" in ASA directly. Ex. 6; Ex. 9; *see also* Ex. 5; Ex. 8.

In turn, a Triggering Event occurs when: (1) a shareholder newly acquires 15% or more of ASA's common shares; or (2) a shareholder with pre-existing ownership of 15% or more of ASA acquires additional shares representing 0.25% or more of the fund's outstanding common shares. Ex. 5 § 1; Ex. 8 § 1; Ex. 6; Ex. 9. Any "rights" held by an investor who has acquired "beneficial ownership of 15% or more of ASA's outstanding common shares" are "void and will not be exercisable." Ex. 6; Ex. 9; *see also* Ex. 5; Ex. 8. All other rights, however, are activated, immediately enabling their holders to increase their ownership in ASA as set forth above. *Id.*

The upshot: were Saba to increase its ownership interest in ASA and trigger the Poison Pill, all other shareholders would be able to acquire additional shares, thereby significantly diluting Saba's ownership stake. Saba, meanwhile, would be deprived of ratable subscription rights proportionate to its ownership stake as a member of the class of common shareholders. The Pill was expressly designed to discriminate against Saba—the only shareholder owning 15% or more of ASA's shares—or any other activist investor that may follow in Saba's footsteps.

The Poison Pill was initially adopted by Defendants on December 31, 2023, with an expiration date of April 29, 2024. R56.1 ¶ 5; Ex. 5. On April 26, just before the Pill was due to expire, the Poison Pill was readopted by Defendants in virtually unchanged form. R56.1 ¶ 8; Ex. 8. In its current iteration, the Pill is nominally set to expire on August 23, 2024. *Id*.

### III.    This Action

Saba has substantial holdings in ASA, amounting to 16.87% of the fund's outstanding common shares. R56.1 ¶ 2. But for the adoption of the Poison Pill, Saba would have acquired additional shares in ASA. Weinstein Decl. ¶¶ 6–14. However, because the purchase of nearly any additional shares would trigger the Pill, Saba has not done so. Weinstein Decl. ¶¶ 6–14.

The Pill therefore interferes with Saba's business practices—building investment stakes in closed-end funds, like ASA, which trade at a significant discount relative to NAV; exercising voting rights and making investors heard in matters pertaining to the proper management of shareholder capital; and advocating for measures designed to allow for shares to trade at or near NAV. Weinstein Decl. ¶¶ 4, 8–14. The Pill prevents Saba from acquiring additional ASA shares to accomplish those goals. Weinstein Decl. ¶¶ 4, 8–14.[2]

As a result of the operation of the Pill, Saba has been made party to an illegal contract,[3] and is precluded from investing in ASA with ratable subscription rights as guaranteed by Section

---

[2]    Notwithstanding the Pill's operation and Defendants' expressed intent to target Saba's interests, two of Saba's nominees—Ketu Desai and Paul Kazarian—were recently elected as Directors by ASA's shareholders at its general meeting, held April 26, 2024. Ex. 13, ASA Press Release (May 1, 2024). Despite this victory and the unseating of two incumbents, however, the Board remains evenly split, with William Donovan and Mary Joan Hoene having been reelected. *See id*.

[3]    *See* Ex. 8, Apr. 26, 2024 Rights Agmt. § 30 (Rights Agreement was made for the benefit of "the Company, the Rights Agent, and the registered holders of the Rights Certificates (and, prior to the Distribution Date, the Common Shares)"); *id*. § 15 ("any registered holder of any Right Certificate [] may, in such holder's own behalf and for such holder's own benefit, enforce, and

18(d), which requires both that any "warrant or right to subscribe to or purchase a security" in the fund be "issued exclusively and ratably" to the fund's shareholders, and that such rights "expir[e] not later than one hundred and twenty days after their issuance." 15 U.S.C. § 80a-18(d).

Accordingly, Saba filed this action to obtain rescission of the Poison Pill, a declaration regarding its unlawfulness, and an order enjoining Defendants from implementing or further extending the Pill.

## LEGAL STANDARD

Summary judgment must be granted upon a showing that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). On such motion, the Court "resolv[es] all ambiguities and draw[s] all factual inferences" in favor of the "non-moving party." *Mudge v. Zugalla*, 939 F.3d 72, 79 (2d Cir. 2019).

A party may file a motion for summary judgment "at any time until 30 days after the close of all discovery." FED. R. CIV. P. 56(b). Specifically, a party may move for summary judgment "at any time after a pleading is served." *Aetna Cas. & Surety Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 573 (2d Cir. 2005). A defendant is not required to answer the complaint before a party moves for summary judgment. *See Gamble v. Tyson*, 17-cv-6635 (LAK) (SN), 2019 WL 5722129, at *6 (S.D.N.Y. Jan. 4, 2019) (citing Wright & Miller, *Federal Practice and Procedure*, § 2718 (3d ed.)). Rather, when the issue is "limited to a pure question of law at the pre-discovery stage," summary judgment may be appropriate without discovery taking place. *Nuveen*, 2022 WL 493554, at *6; *see also BlackRock*, 2024 WL 43344, at *6 & n.13 (finding same); *MCC Non Ferrous*

---

may institute and maintain any suit, action or proceeding against the Company to enforce" the Agreement). *See also Oxford University Bank v. Lansuppe Feeder, LLC*, 933 F.3d 99, 109 (2d Cir. 2019) (holding that ICA § 47(b) creates an implied private right of action to seek rescission of a violative contract); *Nuveen*, 88 F.4th at 115 & n.9 (same).

*Trading Inc. v. AGCS Marine Ins. Co.*, 14-cv-8302 (JCF), 2015 WL 3651537, at *3 (S.D.N.Y. June 8, 2015) ("[W]here it is clear that the nonmoving party cannot defeat the motion by showing facts sufficient to require a trial for resolution, summary judgment may be granted notwithstanding the absence of discovery.").

## ARGUMENT

**I.      Judgment Should Enter in Saba's Favor that the Poison Pill Violates Section 18(d) of the Investment Company Act and Should Be Rescinded.**

Saba seeks rescission of ASA's Poison Pill because it plainly violates Section 18(d) of the ICA, 15 U.S.C. § 80a-18(d). *See Oxford*, 933 F.3d at 106–09 (confirming private right of action under 15 U.S.C. § 80a-46(b)); *Nuveen*, 88 F.4th at 121 (affirming rescission of provisions adopted in violation of ICA). Saba also seeks a declaratory judgment that the Poison Pill violates Section 18(d), and an order enjoining Defendants from implementing or further extending the Pill. Saba's claims present a pure question of law and implicate no genuine disputes of material fact. Given that ASA's Pill, on its face, runs afoul of the ICA, judgment should enter in Saba's favor as a matter of law.

ASA is a closed-end fund regulated by the ICA. R56.1 ¶ 3. Section 18 of the ICA, titled "Capital structure of investment companies," prohibits ICA-regulated funds from issuing special rights to purchase securities, except where such rights both (a) are issued exclusively and ratably to the fund's existing shareholders, and (b) expire within 120 days of issuance. Specifically, Section 18(d) provides:

> It shall be unlawful for any registered management company to issue ***any warrant or right to subscribe to or purchase a security*** of which such company is the issuer, except in the form of warrants or rights to subscribe ***expiring not later than one hundred and twenty days after*** their issuance ***and issued exclusively and ratably*** to a class or classes of such company's security holders . . . .

15 U.S.C. § 80a-18(d) (emphases added).[4]

Where "called upon to interpret the meaning of a federal statute, [the court] look[s] first to the language of the statute itself," and "[w]hen the language of [the] statute is unambiguous, 'judicial inquiry is complete.'" *Hess v. Cohen & Slamowitz LLP*, 637 F.3d 117, 120 (2d Cir. 2011) (quoting *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 290 (2d Cir. 2002) & *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992)). "In conducting this inquiry," the court "'review[s] the statutory text, considering the ordinary or natural meaning of the words chosen by Congress, as well as the placement and purpose of those words in the statutory scheme.'" *Id.* (quoting *Dobrova v. Holder*, 607 F.3d 297, 301 (2d Cir. 2010)). That inquiry here leads inexorably to the conclusion that the Poison Pill violates each of the ICA's basic requirements for such rights to be issued.

### A. The Poison Pill Violates the ICA's Plain-Text Requirement That the Fund Only Issue Rights to Purchase Securities "Ratably."

Section 18(d) is not complicated, and it is unambiguous. Any "right to subscribe to or purchase a security" issued by an ICA-regulated fund must be "issued exclusively and ratably" to the fund's existing shareholders. 15 U.S.C. § 80a-18(d). Such rights cannot be issued to non-shareholders, nor can they be issued to a class of existing shareholders on a preferential (*i.e.* non-ratable) basis. *See, e.g., Ratable*, MERRIAM WEBSTER (11th ed. 2003) ("made or calculated according to a proportionate rate, *i.e. pro rata*"); *Ratable*, BLACK'S LAW DICTIONARY (2d ed.) ("a proportionate ratio of the whole").

ASA's Poison Pill violates this clear mandate. By operation of the Pill, a shareholder owning less than 15% of ASA's outstanding common shares is granted a right to purchase additional shares at a special $1.00 par value rate; a shareholder owning 15% or more of ASA's

---

[4]     The ICA further permits such rights to be issued "in connection with a plan of reorganization." 15 U.S.C. § 80a-18(d). No party disputes that ASA underwent no such reorganization here.

outstanding common shares, however, is denied that same right. Ex. 5; Ex. 8. The Court's analysis can and should begin and end here.

The ICA requires that the issuance of rights to purchase shares be "ratabl[e] to a class or classes of such company's security holders." 15 U.S.C. § 80a-18(d). Here, ASA has only one class: common shareholders. *See, e.g.,* Ex. 3 at 14. And that class of shareholders is selected by the issued subscription rights. *See* Ex. 5 § 1(f); 8 § 1(f) (defining "Person" as a beneficial owner of "common shares"). Although the Poison Pill purports to grant a purchasing right to every outstanding common share, such "rights" are void when held by the owner of 15% or more of ASA's shares. As a result, the subscription rights were not issued ratably and thus violate Section 18(d).

**B. The Second Circuit's Decision in *Nuveen* Forecloses Any Possible Attempt to Reconcile the Pill with the ICA**

It appears ASA's defense will center on the meritless argument that the Pill could somehow be squared with the ICA because it is a restriction on **shareholders**, rather than a restriction on **shares** at issuance. *See* Dkt. 13 at 3. This argument is premised on "share-shareholder" distinction considered and rejected by the Second Circuit just last year. *See Nuveen*, 88 F.4th at 118–20.

1. *Nuveen* Rejects a "Share-Shareholder" Distinction Under the ICA

In *Nuveen*, closed-end funds sought to prevent Saba from having an equal opportunity to vote its shares by adopting a defensive tactic which prevented any shareholder from voting their shares when that shareholder acquiring a greater than 10% ownership in the fund (the so-called "Control Share Provisions"). *See id*. at 117. The Second Circuit held that such Provisions "deprive[d] *some* shares of voting power but not others," and that those Provisions thereby violated a provision of the ICA closely analogous to Section 18(d), which requires that "every share of stock . . . be a voting stock and have equal voting rights with every other outstanding voting stock," *id*. (quoting 15 U.S.C. § 80a-18(i)). As the *Nuveen* court reasoned: "[a] single share acquired by

an investor owning 1% of a Nuveen fund's outstanding shares can be voted, but a single share acquired by an investor taking her to 10% ownership could not." *Id.* at 117.

The Circuit's rationale accords with other decisions from this Court in Saba's favor rescinding defensive tactics that violated Section 18 of the ICA. Earlier in the *Nuveen* litigation, for instance, Judge Oetken explained he was "unconvinced" by the funds' argument that Control Share Provisions were permissible because they stripped "rights from *shareholders* but not from *shares*." *Nuveen*, 2022 WL 493554, at *4. Observing that any such distinction is a "meaningless" one given the structure and purpose of the ICA, the court found it "irrelevant" that "a control shareholder can transfer some of her stock to a different holder, who can vote the stock without restriction if his newly acquired stock" did not put him over the 10% ownership threshold. *Id.* Because "[a]ny interpretation of Section 18(i) that envisages personal discrimination against an investment company shareholder would be flatly inconsistent with the purposes of Section 18(i)," the court reasoned, the pill's operation denied the "equal voting rights" guaranteed by the ICA. *Id.* (quoting *Boulder*, 2010 WL 4630835, at *11, wherein the SEC in a 20-page, reasoned assessment similarly rejected any distinction between stripping rights from shares and shareholders).

Again, in *Saba Capital Master Fund, Ltd. v. BlackRock Municipal Income Fund, Inc.*, Judge Rakoff concluded that "control share resolutions—which strip[ped] the voting rights of shares that would otherwise place any holder at or above 10% of a given fund's voting power— violate[d] the ICA." 2024 WL 43344, at *6. The *BlackRock* court rejected the defendant funds' attempted end-run around *Nuveen* by claiming their provisions targeting Saba and denying it equal voting rights had ostensibly been "required by law" (after they opted-in to Maryland law which "allows funds to adopt such control share resolutions," but did not "require[] as much"). *Id.* And, finding rescission of the "offending resolutions" was "mandatory under the ICA," the court

declined the funds' "invitation to prolong th[e] litigation for the mere chance at making a showing that would not change the result," and granted summary judgment to Saba prior to any discovery taking place. *Id.*

Elsewhere, in *Eaton Vance Senior Income Trust*, a Massachusetts Court also "agree[d] with the reasoning" in *Nuveen* and granted Saba declaratory judgment and recission under the ICA. 2023 WL 1872102, at *6. There, an ICA-regulated closed-end fund sued for a declaratory judgment as to the legality of certain bylaws. Saba filed counterclaims, arguing that provisions in the bylaws—which used language similar to the Control Share Provisions in *Nuveen*—violated Section 18(i) of the ICA. *See Eaton Vance Senior Income Trust v. Saba Capital Master Fund, Ltd.*, 2084-cv-1533-BLS2, 2021 WL 2785120, at *1 (Mass. Super. Ct. Apr. 7, 2021). The court denied the fund's motion to dismiss Saba's counterclaims, rejecting as a matter of law the argument that the "control share" bylaws did not strip voting rights from shares:

> The complaint alleges that this amendment strips shares of their voting rights so long as they are owned by someone who controls more than ten percent of a Trust's voting power. ***If a share cannot be voted by its present owner, then the voting right attached to that share is no longer equal to that attached to shares owned by investors that control a small share of the Trust's total beneficial interest.***

*Id.* at *6 (emphasis added). The court later granted Saba summary judgment, holding that the bylaws violated the ICA's "unambiguous requirement" by "impos[ing] conditions on voting rights on some shares that do not exist for others," resulting in "different shares [] subject to different voting rights, which the statute does not permit." *Eaton Vance*, 2023 WL 1872102, at *6.

The logic of each of these decisions applies with equal force here.  By operation of the Poison Pill, an investor owning less than 15% of ASA is given rights to acquire additional shares, but an investor owning 15% or more of ASA is not. And just as Saba's "equal voting rights" guaranteed by Section 18(i) of the ICA were denied by the Control Share Provisions in *Nuveen*,

*BlackRock*, and *Eaton Vance*, its equal rights to acquire shares—on a basis "ratabl[e]" to its ownership, as guaranteed by Section 18(d)—are denied by the Poison Pill here.

    2.  <u>*Nuveen* Forecloses Any Argument that ASA "Issued" Ratable Subscription Rights</u>

    Relatedly, the Pill cannot be justified because, in some hyper-technical sense, ASA has "issued" subscription rights ratably. *Contra* Dkt. 13 at 3 ("all holders of outstanding common shares, including Saba, were *issued* and presently own one right to purchase a share of ASA for every share they own" (emphasis in original)). By the terms of the Pill at issuance, the subscription rights it offers cannot actually be exercised by Saba (or any other >15% stakeholder). *See* Ex. 5 § 3; Ex. 8 § 3. The rights issued, therefore, are not ratable, and plainly violate Section 18(d).

    Any argument Defendants might advance along these lines is, once again, foreclosed by the Second Circuit's decision in *Nuveen*. The provision of the ICA interpreted and applied by *Nuveen*, Section 18(i), requires that stock "issued" be voting stock with equal voting rights—much like Section 18(d) requires that subscription rights "issue[d]" by a registered fund be "ratable." *Compare* 15 U.S.C. § 80a-18(i), *with id.* § 80a-18(d). The Control Share Provisions invalidated by *Nuveen*, moreover, deprived shareholders of their voting rights based on their post-issuance accumulation of a >10% stake in the fund—much like the Poison Pill deprives shareholders of their subscription rights based on their post-issuance accumulation of a >15% stake in the fund.

    The *Nuveen* Court thus appropriately recognized that the "issuance" of voting rights that cannot be exercised is tantamount to the issuance of no rights at all, and thus were not "equal." *See Nuveen*, 88 F.4th at 117 ("The Amendment also violates Section 80a-18(i) because it deprives *some* shares of voting power but not others—contrary to the provision's guarantee of "equal voting rights." [15 U.S.C.] § 80a-18(i). A single share acquired by an investor owning 1% of a Nuveen fund's outstanding shares can be voted, but a single share acquired by an investor taking her to

10% ownership could not."). So too here, ASA's issuance of subscription rights that cannot be exercised is tantamount to the issuance of no rights at all, and thus are not "ratable."

Long before the Second Circuit's decision in *Nuveen*, the SEC similarly recognized that it would make a mockery of the ICA if funds were permitted to nominally give shareholders federally-protected rights at issuance, only to turn around and deprive shareholders of their ability to exercise those rights in practice. *Boulder*, 2010 WL 4630835, at *7 n.31 ("Consistent with the purposes of Section 18(i), we believe that this is a continuous requirement; any other interpretation would render the provision meaningless, as investment companies might, for example, issue stock with voting rights that expire shortly after issuance.").

3. *Nuveen* Fundamentally Discredits Defendants' Lone Authority in Support of the Pill

Defendants' lone authority in support of the Pill is a twenty-year old, out-of-Circuit district court opinion which is not binding, and which turns on the "share-shareholder distinction" that has now been fundamentally discredited by the Second Circuit. *Neuberger Berman Real Estate Income Fund, Inc. v. Lola Brown Trust No. 1B*, 342 F. Supp. 2d 371 (D. Md. 2004) ("*Neuberger I*"). Any attempt by Defendants to rely on *Neuberger* should, accordingly, be rejected with ease.

In *Neuberger I*, a poison pill adopted by the defendant fund created a purchasing "right" for each outstanding share of common stock, enabling the purchase of additional shares at par value after any investor became an "Acquiring Person" by obtaining ownership of 11% of the fund's shares. *See id*. at 374. Any such purchasing rights attached to shares held by an investor who crossed the 11% ownership mark, however, became void. *See id*. The *Neuberger I* court reasoned that this scheme did not run afoul of Section 18(d) of the ICA, because "[o]ne right is attached to each share," and a "voluntary act of a shareholder to acquire holdings above the poison pill trigger does not violate § 18(d)'s requirement that rights be issued *ratably*." *Id*. at 375. On the

way to that interpretation, the *Neuberger I* court cited other decades-old opinions, each decided under state law, finding "poison pills do not violate state statutes containing anti-discrimination provisions parallel to that found in § 18(d) of the [ICA]," because the pills at issue did "not discriminate among shares but, rather, among shareholders, which is not forbidden." *Id*. (quoting *Harvard Indus, Inc. v. Tyson*, 86-cv-74639 (DT), 1986 WL 36295, at *1 (E.D. Mich. Nov. 25, 1986) (applying Michigan law)); *see also id*. (citing *Dynamics Corp. of Am. v. CTS Corp.*, 805 F.2d 705, 718 (7th Cir. 1986) (Indiana law); *Georgia-Pacific Corp. v. Great N. Nekoosa Corp.*, 728 F. Supp. 807, 810 (D. Me. 1990) (Maine law); *Providence and Worcester Company v. Baker*, 378 A.2d 121 (Del. 1977) (Delaware law)).

The reasoning of the *Neuberger I* court should be rejected here. As an out-of-Circuit district court opinion, it is at best persuasive authority that is "obviously not binding" on this Court. *See City of Providence, Rhode Island v. Bats Glob. Markets, Inc.*, 14-cv-2811 (JMF), 2022 WL 3018090, at *2 (S.D.N.Y. July 29, 2022). Instead, the Second Circuit's recent decision in *Nuveen* controls. *See* 88 F.4th at 118–20. And, as discussed above, *Nuveen **rejected*** any "share-shareholder distinction," which underpins the sole basis for the *Neuberger I* court's erroneous interpretation of Section 18(d). *Id*. Absent a basis for applying that distinction in the context of the ICA, *Neuberger I*'s logic unravels. Indeed, *Nuveen* distinguishes the Delaware Supreme Court's decision in *Baker*—a key case relied upon in *Neuberger I*, 342 F. Supp. At 375—at length. *See* 88 F.4th at 118. The Second Circuit observed that "*Baker **did not recognize a freestanding and universal share-shareholder distinction*** appliable beyond the laws of Delaware," that it "must be read within the context of ***state law***," and that **no "similar provision of the ICA"** was cited in support of such a distinction. *Id*. at 118–19 (emphases added); *see also id*. at 119 (distinguishing *Neuberger I*, "[e]ven assuming" its "embrace of the share-shareholder distinction" had any basis in the ICA);

*Boulder*, 2010 WL 4630835, at *11 nn. 42, 45 (noting the "share/shareholder distinction" recognized under the laws of certain states, and the "freedom traditionally afforded corporate management under state law," but concluding that Congress "determined to regulate investment companies differently").

### C.  The ICA's Policies and Purposes Require Interpreting and Applying § 18(d) in Saba's Favor.

To the extent the Court finds § 18(d), or its application to ASA's Poison Pill, ambiguous, the Court must interpret the statute to further "Congress's policy considerations," which "lean in Saba's favor." *Nuveen*, 88 F.4th at 120.

Congress "instructed courts to interpret the statute with its 'policy and purposes' section in mind—Section 1(b) mandates that 'the provisions of [the ICA] shall be interpreted' 'in accordance with' its stated policies." *Nuveen*, 88 F.4th at 120 (quoting 15 U.S.C. § 80a-1(b)); *see United States v. Nat'l Ass'n of Securities Dealers*, 422 U.S. 694, 720 (1975) (courts "must interpret the Investment Company Act in a manner most conducive to the effectuation of its goals"); *Chabot v. Empire Trust Co.*, 301 F.2d 458, 461–62 (2d Cir. 1962) ("Section 1 of the [ICA] . . . instructs the courts to interpret the provisions of the act in a manner that will 'mitigate, and, so far as is feasible, . . . eliminate the conditions enumerated in this section which adversely affect the national public interest and the interest of investors.'" (quoting 15 U.S.C. § 80a-1)).

"Congress passed the ICA 'to provide a comprehensive regulatory scheme to correct and prevent certain ***abusive practices in the management*** of investment companies for the ***protection of persons who put up money to be invested*** by such companies [on] their behalf,' *i.e.*, the shareholders." *Nuveen*, 88 F.4th at 120 (quoting *Indep. Inv. Protective League v. Sec. & Exch. Comm'n*, 495 F.2d 311, 312 (2d Cir. 1974)). "These corrections were 'enacted for the benefit of investors,' not fund insiders, and passed primarily to 'correct the abuses of self-dealing,' which

17

led to the 'wholesale victimizing' of shareholders from 'fantastic abuse[s] of trust by investment company management.'" *Id.* (citations omitted); *accord Option Advisory Serv. v. Sec. & Exch. Comm'n*, 668 F.2d 120, 121 (2d Cir. 1981); *Mathers Fund, Inc. v. Colwell Co.*, 564 F.2d 780, 783 (7th Cir. 1977); *Herpich v. Wallace*, 430 F.2d 792, 815–16 (5th Cir. 1970).

Saba seeks to vindicate the same policies as it did in *Nuveen*, and which the Second Circuit held "lean in Saba's favor." 88 F.4th at 120. The ICA was "enacted for the benefit of investors," like Saba, "not fund insiders," like ASA's incumbent trustees. *Id.* Here, as in *Nuveen*, Saba seeks to vindicate the ICA's purpose to prevent ASA from being "organized, operated, and managed" in the interest of its "directors, officers, investment advisers, depositors, or other affiliated persons thereof." *Id.* (citing 15 U.S.C. § 80a-1(b)(2)). And, as in *Nuveen*, Saba seeks to remedy ASA's failure to "protect the preferences and privileges of the holders of their outstanding securities"— namely, shareholders' equal subscription rights to acquire shares ratably—through the use of "inequitable or discriminatory provisions." *Id.* (citing 15 U.S.C. § 80a-1(b)(3)).

### D. The Poison Pill Also Violates the ICA's Plain-Text Prohibition on Such Subscription Rights Extending Beyond 120 Days.

Although the Court need to reach the issue given that ASA's Poison Pill may be invalidated for the reasons already discussed, the Pill also violates the ICA's limit on the duration of subscription rights.

#### 1. Defendants Have Issued the Pill to be Continuously Effective for At Least 236 Days

The ICA prohibits the issuance of subscription rights "except in the form of warrants or rights to subscribe expiring ***not later than one hundred and twenty days after*** their issuance." 15 U.S.C. § 80a-18(d) (emphasis added). Defendants issued the Poison Pill on December 31, 2023. R56.1 ¶ 5; *see also* Ex. 5. The issuance provided for a "final expiration date" of April 29, 2024, precisely 120 days thereafter. Ex. 5 § 1(s) ("'Final Expiration Date' shall mean the Close of

18

Business on April 29, 2024"). However, on April 26, 2024—days before the Pill was due to expire, and conspicuously hours before the General Election for ASA's Directors—Defendants extended the Poison Pill for an additional four-month period. *See* R56.1 ¶ 8; Ex. 8 § 1(s) (now providing that "'Final Expiration Date' shall mean the Close of Business on August 23, 2024"). The Poison Pill was unaltered apart from the new nominal expiration date. *See id*.

The Pill's subscription rights therefore extend *at least* 236 days—from December 31, 2023 until August 23, 2024—which is "later than" 120 days "after their issuance," and thus also in clear violation of the ICA. *See* 15 U.S.C. § 80a-18(d); *see also SEC v. Imperiali, Inc.*, 12-80021-cv, 2013 WL 12080193, at *6 (S.D. Fla. Sept. 25, 2013), *report and recommendation adopted*, No. 12-cv-80021, 2013 WL 12080173, *aff'd*, 594 F. App'x 957 (11th Cir. 2014) (granting summary judgment to the SEC on a Section 18(d) claim where defendants "failed to offer any evidence to refute" that convertible shares were issued without an expiration date occurring within 120 days of their issuance). Indeed, because ASA issued the April 26, 2024 Rights Agreement before the limited-duration period was set to expire on April 29, there was never even a moment when Saba would have been able to acquire additional shares, and never a moment when the Pill's purportedly "limited-duration" subscription rights were not in place. *See S.E.C. v. Sloan*, 436 U.S. 103, 111–12 (1978) (rejecting argument that repeatedly reissued trade suspensions did not violate an analogous statute, which permitted such suspensions "for a period not exceeding ten days").

The Poison Pill thus violates the statutory mandate that such rights expire within 120 days of their issuance. *See* 15 U.S.C. § 80a-18(d). Accordingly, rescission should also be granted, and judgment entered in Saba's favor, on this independently sufficient basis.

2. Defendants' Lone Authority Failed to Resolve the ICA's Ambiguity Given its Purposes

Defendants, it appears, will rely on similarly unpersuasive authority to defend the duration

of their Poison Pill. *See* Dkt. 13 at 3. The same out-of-Circuit district court, which upheld subscription rights issued non-ratably by relying on a share-shareholder distinction since discredited by the Second Circuit, later also upheld that pill's continuous operation beyond 120 days notwithstanding Section 18(d). *Neuberger Berman Real Est. Income Fund, Inc. v. Lola Brown Tr. No. 1B*, 485 F. Supp. 2d 631, 637 (D. Md. 2007) ("*Neuberger II*"). Any limited persuasive authority afforded by that decision, however, is overcome by the *Neuberger II* court's failure to resolve acknowledged statutory ambiguity in favor of shareholders like Saba, instead of incumbent management like Defendants, given the ICA's policies and purposes as described above. *See supra* § I(C). When assessed in light of *Nuveen*'s articulation and application of those congressional purposes, Section 18(d) cannot be read to allow for the perpetual operation of defensive mechanisms, like ASA's Poison Pill, designed to protect entrenched interests.

 *Neuberger II* failed to properly apply the ICA's policies and purposes and, like *Neuberger I*, has been fundamentally discredited by *Nuveen*. The *Neuberger II* court observed it was "'***not an impossible reading of*** the 120 day limitation in 18(d) to interpret the statutory language as unconcerned with the *number* of poison pills, but rather, as the language suggests, as concerned only with the *duration* of any particular pill," and that such a reading was "'the most natural [and] logical one.'" 485 F. Supp. 2d at 638 (quoting *Sloan*, 436 U.S. at 113) (first emphasis added). To bolster its interpretation given the conceded ambiguity, the court found its reading was "supported by consideration of the evident purposes of a legitimate poison pill." 485 F. Supp. 2d at 638.

 As described above, however, the Second Circuit has since articulated the ICA's policies and purposes at length, explaining it was enacted to prevent "abusive practices in the management of investment companies" for "the benefit of investors, not fund insiders." *Nuveen*, 88 F.4th at 120 (internal citation omitted). *See also Indep. Inv. Protective League*, 495 F.2d at 312 (same); *Option*

*Advisory Serv.*, 668 F.2d at 121 (same). Bound by the Second Circuit's clear statement of those purposes, rather than the outdated and incorrect assessment offered by *Neuberger II*—which that court expressly acknowledged did *not* even account "for the important differences between closed-end investment companies and ordinary corporations," 485 F. Supp. 2d at 638—this Court should not follow that decision's erroneous holding here.[5]

## II.  Rescission is Mandatory because the Poison Pill Conflicts with Both the Text and Purposes of the ICA.

Saba seeks rescission under Section 47(b) of the ICA, because the Poison Pill violates Section 18(d). *See Oxford*, 933 F.3d at 106; 15 U.S.C. § 80a-46(b) ("(1) A contract that is made, or whose performance involves, a violation of this subchapter . . . is **unenforceable by either party** . . . . [and] (2) To the extent that a contract described in paragraph (1) has been performed, **a court may not deny rescission at the instance of any party** unless such court finds that under the circumstances the denial of rescission would produce a more equitable result than its grant **and would not be inconsistent with the purposes of this subchapter**." (emphases added)).

Defendants may argue that further discovery, or some sort of free-wheeling equitable balancing, is required before this Court may grant rescission. But nothing in § 80a-46(b)(2) makes equitable balancing a precondition to granting rescission. Just the opposite: § 80a-46(b)(2) makes balancing the equities a precondition to **denying** rescission, not granting it. As recognized recently

---

[5]      *Neuberger II* is also procedurally distinguishable. Earlier in the litigation, rather than appealing the denial of a preliminary injunction to revoke the poison pill, several activist investors sought an order "certifying [that the court's] declaratory judgment was immediately appealable," which the court issued only after a representation that their "tender offer **would be abandoned** if the court's ruling on the validity of the poison pill were upheld." *Id.* at 634 (emphasis added). The court faulted the investors for pursuing this path, noting the reasons for failing to appeal the PI ruling "remain[ed] elusive." *See id.* at 637 n.5. In effect: the court faulted the activist investors for (a) agreeing to withdraw an offer to purchase shares if the pill were upheld only to (b) argue years later that the pill's continuous operation was unlawful. Saba has represented that, but for the Poison Pill here, it would have increased its ownership share in ASA. *See* Weinstein Decl. ¶ 14.

by the Second Circuit and this Court, once the Pill is found to violate the ICA, no further inquiry is necessary or required to order its rescission. *See Nuveen*, 88 F.4th at 120 n.16; *BlackRock*, 2024 WL 43344, at *6 ("Although a court may not <u>deny</u> rescission unless [equitable] showings have been met, equitable balancing is not required to <u>grant</u> rescission.").

Furthermore, because Defendants' adoption of the Poison Pill is flatly ***inconsistent*** with the letter and purposes of the ICA, the ICA ***requires*** this Court to order rescission of the Pill. The ICA issues a directive against the denial of rescission of contracts that offend the ICA. 15 U.S.C. § 80a-46(b)(2) ("a court ***may not deny*** rescission" of a contract "that is made, or whose performance involves, a violation" of the ICA (emphasis added)). It then creates an exception—specifically, it identifies two conditions that must be met before courts may deviate from the statutory directive to grant rescission of offending contracts. *Id.* (court may deny rescission of ICA-offending contract only if it "[1] finds that under the circumstances the denial of rescission would produce a more equitable result than its grant ***and*** [2] would not be inconsistent with the purposes" of the ICA (emphasis added)).

The only decisions in this Circuit to address defensive mechanisms like the Poison Pill have found them inconsistent with both the ICA's text and its policies and purposes, and thus concluded—as a matter of law, without the need for discovery—that rescission is required. *See Nuveen*, 88 F.4th at 121, *aff'g Nuveen*, 2022 WL 493554, at *6; *BlackRock*, 2024 WL 43344, at *7. Saba seeks to vindicate the same policies as it did in *Nuveen*, and which the Second Circuit held "lean in Saba's favor." 88 F.4th at 120; *see supra* at 18. The ICA thus ***mandates*** rescission of ASA's Poison Pill given its inconsistency with the policies and purposes of the statute.

Each of *Nuveen*, *BlackRock*, and *Eaton Vance* held that defensive tactics similar to ASA's Poison Pill—tactics which "discriminat[ed] against an investment company shareholder," and

22

served to entrench incumbent management—were "inconsistent with the purposes of" Section 18 of the ICA. *Nuveen*, 2022 WL 493554, at *3; *BlackRock*, 2024 WL 43344, at *6; *Eaton Vance*, 2023 WL 1872102, at *8. And because the defensive tactics at issue were inconsistent with the purposes of the ICA, those courts properly concluded they lacked discretion to deny rescission. *See BlackRock*, 2024 WL 43344, at *6 n.13 ("[e]ven if the Court permitted discovery, defendants cannot show that 'the denial of rescission would not be inconsistent' with the ICA's purposes" because Congress passed the ICA "for the benefit of investors, not fund insiders, and . . . primarily to correct the abuses of self-dealing"); *Nuveen*, 2022 WL 493554, at *4 (following statutory directive that the Court "may not deny rescission" of the offending Control Share Amendment, 15 U.S.C. § 80a-46(b)(2), after finding the Amendment not only contrary to Section 18(i) but also "flatly inconsistent with the purposes" of Section 18(i)); *Eaton Vance*, 2023 WL 1872102, at *8 (same; "Section 46(b) does not permit the Court to sanction actions that are 'inconsistent with the purposes of this subchapter'").

Here, too, equitable balancing is neither necessary nor appropriate. The ICA makes clear that rescission of the Pill is ***mandatory*** given its inconsistency with the statute's basic policies and purposes.

### III.   Saba is Entitled to Declaratory and Injunctive Relief, Against All Defendants, as Customary Incidents of Saba's Action for Rescission

The Second Circuit has repeatedly confirmed that Saba has a private right of action for rescission under 15 U.S.C. § 80a–46(b). *See Oxford*, 933 F.3d at 104–09; *Nuveen*, 88 F.4th at 115 & n.9. Second Circuit and Supreme Court precedents also confirm that such right of action must come with all of its "customary legal incidents"— including declaratory and injunctive relief.

Saba is entitled to a declaration that the Poison Pill violates the ICA and, because it binds shareholders to waive compliance with §18(d), is thereby "void." 15 U.S.C. § 80a–46(a); *cf.*

*Boulder*, 2010 WL 4630835, at \*12 n.46 (when a fund adopts provisions that "bind its shareholders to waive their rights" such provisions are "void" under § 80a-46(a)). In other cases in which Saba has obtained rescission of provisions that offend the ICA, courts have issued a declaration of their illegality as well. *E.g.*, *Nuveen*, 2022 WL 493554, at \*6 ("[T]he Court also concludes that Saba is entitled to summary judgment on both its rescission claim and its declaratory judgment claim."); *BlackRock*, 2024 WL 43344, at \*7 ("The Court declares that the control share resolutions at issue violate Section 18(i) of the ICA and orders that those resolutions be rescinded forthwith"); *Eaton Vance*, 2023 WL 1872102, at \*13 (granting Saba's motion for summary judgment as to its claims "for recission and declaratory judgment" related to ICA-offending provisions).

Saba is likewise entitled to injunctive relief that is the natural incident to rescission of the offending Pill. The Supreme Court has treated actions for rescission and for an injunction against the operation of a contract as being effectively interchangeable—including specifically in the context of the ICA's "companion legislation," the Investment Advisors Act (IAA). In fact, in construing the private right of action available under § 80a-46(b), *Oxford* relied heavily on the Supreme Court's interpretation of a "similar provision" of the IAA, 15 U.S.C. § 80b-15. *Oxford*, 933 F.3d at 106–07 (discussing *Transamerica Mortgage Advisors (TAMA) v. Lewis*, 444 U.S. 11 (1979)). In *TAMA*, the Supreme Court concluded that 15 U.S.C. § 80b-15 included "the customary legal incidents of voidness . . . including the availability of a suit for rescission ***or for an injunction against continued operation of the contract***." 444 U.S. at 19. The *TAMA* Court, moreover, reasoned that the IAA's jurisdictional provision "though referring in terms only to 'suits in equity to ***enjoin*** any violation,' would equally sustain actions where . . . ***rescission*** is sought." *Id.* at 19 n.9. Consonantly, and more recently, the Second Circuit specifically analogized Saba's cause of action for rescission and declaratory relief under the ICA to a cause of action for "forward-looking,

*injunctive relief* to prevent [] harm from occurring." *See Nuveen*, 88 F.4th at 116 n.11; *accord BlackRock*, 2024 WL 43344, at *3. Saba's request for relief here is substantively no different: Saba seeks injunctive relief to prevent the harm that would occur if the Poison Pill were allowed to be implemented or further extended.

Finally, contrary to Defendants' suggestion, *see* Dkt. 13 at 3, Saba appropriately seeks relief against both ASA and the Director Defendants who participated in the adoption of the Pill, who will be responsible for effecting its rescission, and/or who may otherwise attempt to implement or further extend the Pill. *See BlackRock*, 2024 WL 43344, at *6 (concluding that Saba appropriately sought relief against individual Directors who participated in adoption of ICA-offending provision, including an injunction preventing those defendants from applying that unlawful provision).

## CONCLUSION

The Poison Pill deprives ASA's shareholders of ratable subscription rights, in plain violation of ICA Section 18(d). Saba is entitled to rescission of the Pill, a declaratory judgment that the Pill violates the ICA and is void, and an injunction enjoining Defendants from implementing or further extending the operation of the Pill.

Dated: May 24, 2024

*/s/ Mark Musico*
Jacob W. Buchdahl
Mark Musico
Zach Fields
SUSMAN GODFREY LLP
One Manhattan West, 50th Floor
New York, NY 10001
Tel: 212-336-8330
mmusico@susmangodfrey.com
jbuchdahl@susmangodfrey.com
zfields@susmangodfrey.com

*Attorneys for Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 24, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

<u>*/s/ Zach Fields*</u>
Zach Fields
